IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

HERBERT H. MULLINEX, JR., and
PATRICIA E. MULLINEX,

           **Plaintiffs,**

v.                                 **Case No. 4:18-cv-00033-AWA-DEM**

JOHN CRANE, INC.,

           **Defendant.**

**PLAINTIFFS' OPPOSITION TO JOHN CRANE INC.'S MOTION TO DISMISS
PLAINTIFFS' MARITIME LAW CLAIMS FOR LACK OF SUBJECT MATTER
JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(1)**

Defendant, John Crane, Inc. (JCI), filed a motion to dismiss Plaintiffs' maritime law claims for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). This Court should deny JCI's motion for three reasons. First, this Court has already ruled that it has federal subject matter jurisdiction over this case independent of its admiralty jurisdiction, and Plaintiffs have never alleged admiralty *jurisdiction* or invoked the federal admiralty rules under Federal Rule of Civil Procedure 9(h). Plaintiffs have only alleged that general maritime law is the *substantive law* applicable to this case. As a result, JCI's motion is a misplaced attempt to challenge the *choice of law* to be applied to Plaintiffs' claims rather than this Court's subject matter jurisdiction. Since a motion under Rule 12(b)(1) is not the proper vehicle to raise a choice of law issue, this Court should deny JCI's motion.

Second, this case is a maritime product liability case arising from the exposure of a seaman to a toxic carcinogen during the traditional maritime activities of operating, maintaining, and repairing the propulsion plant of ships that were built and commissioned years or even decades earlier and that were underway or undergoing repairs on navigable waters at the time of the toxic, carcinogenic exposures. In contrast, this Court's order in *Gilstrap v. Huntington Ingalls, Inc.,* 4:19-

cv-68-AWA-DEM, involved only premises liability claims regarding exposure while on the premises of a shipyard. Additionally, this Court was considering a Rule 12(b)(6) motion, the issues of subject matter jurisdiction or choice of law were never raised or briefed by the parties, and this Court analyzed the issue *sua sponte* in order to determine whether to analyze the sufficiency of the plaintiff's amended complaint under federal or state pleading standards.

Third, asbestos product liability cases involving workers exposed on navigable waters, like this one, have been consistently found to arise under general maritime law. This has been true in virtually every jurisdiction to consider the issue since the Supreme Court's decision in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 543 (1995), when the Supreme Court definitively rejected the complex, multifactor tests that had previously been applied by various Circuit Courts of Appeals such as the Fifth Circuit in *Kelly v. Smith* and the Fourth Circuit in *Oman v. Johns Manville*. Instead, the Court reiterated that the simplified *Sisson v. Ruby* nexus test controls the maritime law and jurisdiction analyses.[1]

Since the Supreme Court decided *Sisson* and *Grubart*, state and federal courts have consistently held that asbestos product liability cases like this one meet both elements of the maritime nexus test necessary for the implementation of general maritime law.[2] JCI is aware of this point because JCI has been involved in state and federal cases addressing this issue since at least 1999 in *Lambert v. Babcock & Wilcox, Co.*, 70 F. Supp. 2d 877 (S.D. Ind. 1999) (listing JCI as one of the defendants). In fact, in 2007 the Supreme Court of Virginia rejected JCI's arguments and held that general maritime law governs the claims of a shipyard worker who was exposed to

---

[1] As early as *Sisson v. Ruby,* the Court resisted suggestions that it adopt these multifactor tests, and opted for a simpler, more inclusive, test. *Sisson v. Ruby,* 497 U.S. 358, 365 n.4 (1990).

[2] JCI's motion does not appear to challenge the location prong of the maritime test, but Mullinex was a sea-based maritime worker whose entire known exposure occurred on ships on navigable waters. Accordingly, this case satisfies the location prong as well.

asbestos gaskets and packing on vessels on navigable waters. *See John Crane, Inc. v. Jones,* 650 S.E.2d 851, 855 (Va. 2007). JCI's brief does not analyze this case under the controlling Supreme Court precedent. But this case is no different than *John Crane, Inc* because it satisfies the *Sisson* nexus test.

Because this issue does not involve this Court's subject matter jurisdiction, bears no resemblance to *Gilstrap*, and meets the requirements for application of general maritime law under controlling Supreme Court precedent, this Court should deny JCI's motion.

## RELEVANT FACTS

### A.  Mullinex's Maritime Exposure.

This case is a product liability case by a Navy seaman who was exposed to asbestos as a machinist mate for nearly ten years on three commissioned Navy ships while they were underway and undergoing repairs and overhauls in port. His work, from start to finish, was performed on ships on navigable waters. Herbert Mullinex enlisted in the U.S. Navy in May 1969 and worked as a fireman and machinist mate in the engine rooms of three Navy ships. (*See* Ex. 1, *Mullinex Deposition* 05/09/17 at 19, 21; Ex. 2, *Mullinex DBE Deposition,* 07/02/18 at 15). In December 1969, he was assigned to USS Holder, a Navy destroyer, with the rank of machinist mate fireman (*MMFN*). (*See* Ex. 2,  at 16). He worked in the forward engine room of the ship with 12 to 15 other machinist mates to operate, maintain, and repair valves, pumps, and other equipment while the ship was underway and in port. (*See* Ex. 2, at 17-18). Much of this work involved replacing asbestos gaskets and packing. Mullinex and his coworkers testified that JCI was one of the main manufacturers of the asbestos gaskets and packing that they used in the Navy.

From January to July 1970, Mullinex worked in the forward engine room of USS Holder during a Navy cruise to the Mediterranean. The ship occasionally docked in Naples, Italy, for repairs, during which time he continued to work in the forward engine room. (*See* Ex. 2, at 23-24).

From July 1970 until February 1971, USS Holder was homeported in Norfolk, where Mullinex and his shipmates continued to maintain and repair propulsion plant equipment on the vessel. (*See* Ex. 2, at 24). From March to June 1971, the ship was overhauled at the Philadelphia Naval Shipyard. Mullinex worked onboard the ship throughout the overhaul and, during that time, hundreds of valves were removed and repaired. (*See* Ex. 2, at 25). Each valve typically contained 3 asbestos gaskets: 2 flange gaskets and a bonnet gasket; consequently, there were at least 500 to 1,000 gaskets that would be removed and replaced in each engine room. (*See* Ex. 2, at 38-39). Throughout his service on USS Holder, Mullinex's duties, and those of the other machinist mates, included the routine fabrication and removal of asbestos gaskets (flange gaskets and bonnet gaskets) and asbestos valve and pump packing. (*See* Ex. 3, *Plt's ATIs, Ex 1, 2 and 2A at Ex. 2A; See Ex. 1 at 28; See also* Ex. 2 at 78).

In July 1971, Mullinex was transferred to USS Allen M. Sumner, another destroyer, where he continued the routine and frequent fabrication and removal of asbestos gaskets and packing in the forward engine room of the ship. (*See* Ex. 3, at Exhibits 1, 2, 2A and 4; S*ee also* Ex. 4, Mullinex Discovery Depo 5/10/17, at 33-34; Ex. 2 at 26-27). Approximately 70 percent of his time on USS Sumner involved working in the engine room with twelve to fifteen other machinist mates, and 30 percent of his time was spent in the log room of the ship doing administrative work related to technical manuals, daily logs, and ordering parts and materials for the ship. (*See* Ex. 2 at 26-27, 166). Mullinex's job duties in the engine room on USS Sumner were the same as on USS Holder with the additional responsibility of teaching lower-ranking crew members the duties of a machinist mate. (*See* Ex. 2 at 26). USS Sumner was overhauled from May to July 1972 at Philadelphia Navy Yard, (S*ee* Ex. 2 at 28-29); and in June 1972, Mullinex was promoted to machinist mate second class. (S*ee* Ex. 2, at 28-30, 165). He continued to routinely and frequently

install and remove asbestos packing and remove, fabricate, and install asbestos gaskets in the forward engine room of the ship, (S*ee* Ex. 3, at exhibits 2 and 2A; S*ee also* Ex. 1 at 69; Ex. 2 at 93), until March 1973 when Mullinex left USS Sumner. (S*ee* Ex. 3, at exhibits 1, 2, and 4; S*ee also* Ex. 1, at 62; Ex 2 at 27).

In April 1973, Mullinex was transferred to USS Fulton, where he was assigned to the ship's O2N2 plant making liquid oxygen and liquid nitrogen. During his time on USS Fulton, Mullinex did not personally use any asbestos-containing products and did not recall any use or removal of asbestos products in his presence. While onboard USS Fulton, Mullinex was promoted to machinist mate first class. (*See* Ex. 2 at 31).

Mullinex left USS Fulton in December 1974 and was transferred to shore duty until March 1977. (*See* Ex. 3, at exhibit 1; S*ee also* Ex. 2; Ex. 4). His shore-based duties also did not involve any asbestos exposure. (*See* Ex. 1 at 93).

In April 1977, Mullinex was transferred to USS Edson, another destroyer, where he was assigned to work as a machinist mate in both the forward and the aft engine rooms. (*See* Ex. 1 at 93-94; Ex. 2 at 32). Each of these engine rooms also had twelve to fifteen other machinist mates. (*See* Ex. 2 at 33). USS Edson was a reserve ship; consequently, it stayed in port approximately 70 percent of the time. (*See* Ex. 2 at 34). Mullinex's day to day duties in the engine rooms of USS Edson as a machinist first class were primarily as a supervisor of other machinist mates whose duties included regular and frequent fabrication, installation, and removal of asbestos gaskets as well as cutting, installing, and removing asbestos packing from valves, pipes, and other equipment in the engine room. (*See* Ex. 1 at 105, 113; Ex. 2 at 33).

On USS Edson, the machinists in the engine room did the same work as on USS Holder and USS Sumner, but they removed "a little more" valves, i.e., 6 valves a week, which resulted in

fabricating and removing as many as 24 gaskets a week. (*See* Ex. 2 at 97-98). USS Edson underwent an extended repair period during September and October of 1970 in Norfolk, Virginia. Mullinex's day to day duties were in USS Edson's engine rooms supervising and helping with the work of subordinate machinist mates.

Mullinex testified that he was sent to an asbestos safety course October 1978. (*See* Ex. 1 at 119). Though the course focused on asbestos insulation and did not mention any health risk or danger associated with fabricating or removing asbestos gaskets and packing, Mullinex decided on his own to use a mask and Tyvek clothing whenever he or the machinists in his crew fabricated or removed asbestos gaskets in USS Edson's engine rooms. (*See* Ex. 1 at 119, 125-127; Ex. 2 at 131-132; Ex. 3, at exhibit 2A, page 6; Ex. 4 at 78, 113). Mullinex continued to serve on two more ships in his Navy career; but from 1979 until he retired from the Navy in February 1989, Mullinex wore a mask and Tyvek protective clothing whenever he worked around asbestos products. (*See* Ex. 1 at 126-127; Ex. 2 at 131-132; Ex. 3, at exhibit 2A, p. 6).

Mr. Mullinex developed mesothelioma in 2016, and he and his wife filed a maritime product liability lawsuit against JCI and other defendants in the Circuit Court for the City of Newport News. JCI removed this case to this Court one business day before the state court trial was scheduled to begin. Mr. Mullinex sued product manufacturers for their respective failures to warn of the hazards of products that Mr. Mullinex worked with and repaired during his work as a Navy fireman and machinist mate in the engine rooms of USS Holder, USS Sumner, and USS Edson. His lawsuit does not contain any premises liability claims against any shipyards.

**B.  Gilstrap's Premises Liability Claims.**

In contrast, the *Gilstrap* case that JCI relies upon is very different. By the time this Court addressed the shipyard's Rule 12(b)(6) motion in *Gilstrap* in December 2019*,* the plaintiff had voluntarily dismissed all product liability claims and the only remaining claims related to the alleged premises liability of the Huntington Ingalls shipyard. (Amended Complaint in *Gilstrap,* ECF 12 in *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM; Notice of Dismissal in *Gilstrap,* ECF 15 in *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM).

Paragraph 2 of the Amended Complaint states: "Prior to the commission of the USS Robert E. Lee in September of 1960, Mr. Gilstrap worked aboard the ship during its construction, and its sea trials in Newport News." (Amend. Comp. in *Gilstrap,* ECF 12 in *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM, at 2, ¶ 2). In the plaintiffs' response to HII's Rule 12(b)(6) Motion to Dismiss, the plaintiffs emphasized that Mr. Gilstrap's premises liability claims were limited to the time "**Prior to the commission of the USS Robert E. Lee in September of 1960**". (Opp. to Mot. To Dismiss in *Gilstrap,* ECF 16 from *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM, at 3 (emphasis in original)). Exhibit A to the plaintiffs' amended complaint says that Mr. Gilstrap was "Engine Room Supervisor" of USS Robert E. Lee from 1959-1964. But until September 1960, the uncommissioned hull was still under construction, and the plaintiffs alleged it was still under the Shipyard's "ownership, dominion, and control." (Amend. Comp. in *Gilstrap,* ECF 12 from *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM, at 3, ¶ 2). Because the Navy had not yet accepted or commissioned the vessel, Gistrap would not have been engine room supervisor of something the Navy did not yet own.

More importantly, the plaintiffs' premises liability count, Count IV, clarified that the premises was located at Newport News Shipbuilding, Newport News, Virginia. (Amend. Comp.

in *Gilstrap,* ECF 12 from *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM, at 13, ¶ 43). Count IV went on

to state that the premises liability defendants caused asbestos containing materials to be used and

manipulated on "each of the aforesaid respective premises, **including the general areas of the**

**shipyard at large,**" (Amend. Comp. in *Gilstrap,* ECF 12 from *Gilstrap v. HII,* 4:19-cv-68-AWA-

DEM, at 14, ¶ 45 (emphasis added)). Though Count IV alleges that the shipyard's workers were

working with products destined to be installed aboard ships, it never states that Mr. Gilstrap was

actually exposed on any ship or launched vessel under construction; nor does it contain any

allegation that would enable this Court to determine whether any such ship-based work, if any,

preponderated over his land-based work.

## ARGUMENT

### I.     Background on Maritime Law.

#### A.  The Evolution of the Maritime Connection Test.

For almost two centuries, the "traditional test for admiralty tort jurisdiction asked only

whether the tort occurred on navigable waters. If it did, admiralty jurisdiction followed; if it did

not, admiralty jurisdiction did not exist." *Grubart*, 513 U.S. at 531-32 (citing *Thomas v. Lane*, 2

Sumn. 1, 23 F. Cas. 957, 960 (No. 13902) (CC Me. 1813) (Story, J., on Circuit)); *Sisson v. Ruby*,

497 U.S. 358, 360-61 (1990); *The Plymouth*, 70 U.S. (3 Wall.) 20, 36 (1866) ("Every species of

tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable

waters, is of admiralty cognizance."). Acknowledging that this "locality test" "grew up in an era

when it was difficult to conceive of a tortious occurrence on navigable waters other than in

connection with a waterborne vessel," the Court in 1972 created an additional test—the nexus, or

connection, test—for cases involving aircraft, which, "[u]nlike waterborne vessels, . . . are not

restrained by one-dimensional geographic or physical boundaries." *Executive Jet Aviation, Inc. v*

*City of Cleveland, Ohio*, 409 U.S. 249, 254, 268 (1972). The *Executive Jet* holding was limited, on its face, to "claims arising from airplane accidents . . . ." *Id.* at 268.

After *Executive Jet*, the Fifth Circuit formulated a multifactor analysis for application of the nexus test and extended it beyond the confines of aircraft cases. *See Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1973). The Ninth Circuit in *T. J. Falgout Boats, Inc. v. United States*, 508 F.2d 855, 857 (9th Cir. 1974), and the Fourth Circuit in *Oman v. Johns-Manville Corp.*, 764 F.2d 224, 226 (4th Cir. 1985), later adopted virtually identical versions of this multifactor nexus test.[3]

Under these multifactor tests, courts engaged in a fact intensive analysis to determine whether the particular facts of the case bore a "significant relationship to traditional maritime activity." *Oman*, 764 F.2d at 227 (citations omitted). The factors included: "the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law." *Kelly*, 485 F.2d at 525; *see also Oman*, 764 F.2d at 230.

In 1982, the Supreme Court addressed the application of maritime law again in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668 (1982). There, the district court applied the *Kelly/Oman* test and found that general maritime law did not apply to a case involving a collision between two recreational boats in navigable waters far up an inland waterway in Louisiana. *See Foremost Ins. Co.*, 457 U.S. at 670 (citing *Richardson v. Foremost Ins. Co.*, 470 F. Supp. 699, 700 (M.D. La. 1979)). The Fifth Circuit reversed the district court, and the Supreme Court agreed, holding that

---

[3] In adopting this multifactor nexus test, the sharply divided *Oman* court overturned a unanimous panel decision that had found that maritime law applied to asbestos-related cases involving shipyard workers on vessels in navigable waters. *See White v. Johns-Manville*, 662 F.2d 234, 239 (4th Cir. 1981). *Oman* overruled *White* solely on the basis of its adoption of the *Kelly* multifactor test. By rejecting this multifactor test, the Supreme Court's decisions in *Sisson* and *Grubart* have essentially annulled this portion of *Oman*.

maritime law was appropriate because the "negligent operation of a vessel on navigable waters" bore a "sufficient nexus to traditional maritime activity . . . ." *Id.* at 674. Though the validity of the *Kelly* test was not under review, it was significant that the district court's fact intensive application of that test clearly counseled against the application of maritime law. The Supreme Court, however, was not concerned with the particular facts, but the general character of the case—i.e., one involving vessels on navigable waters. In short, the multifactor test formulated by *Kelly* and adopted in *Oman* was more restrictive than the Supreme Court desired, and it was excluding from general maritime law cases that the Supreme Court and traditional admiralty jurisprudence would have placed firmly under maritime law.

The Supreme Court again disapproved of the restrictive multifactor tests in *Sisson v. Ruby*, 497 U.S. 358, 360 (1990). In *Sisson,* the Court held that a fire that started in the washer/dryer unit of a pleasure yacht docked at a marina on a navigable waterway was controlled by maritime law.[4] "[T]he parties and various *amici*" suggested that the Court adopt the *Kelly/Oman* test or one of the other multifactor tests, but the Court declined. *Sisson*, 497 U.S. at 367 n. 4. The Court disapproved any "narrow" analysis of traditional maritime activity that was defined by the "*actual* effects on maritime commerce . . . , the particular facts of the incident in this case," *id.* at 363, or the "particular circumstances of the incident . . . ," *id.* at 364. Instead, the Court emphasized that the jurisdictional inquiry must revolve around the case's "general character," *id* at 363, the "general features of the type of incident involved," *id.*, and "the general conduct from which the incident arose," *id.* at 364.

---

[4] Though the case was brought as a limitation of liability case, the Court decided the admiralty question under 28 U.S.C. § 1331(1), which provides jurisdiction to courts in "[a]ny civil case of admiralty or maritime jurisdiction . . . ." *See* 28 U.S.C. § 1331(1).

The Supreme Court resolved any doubt about the continued vitality of the *Kelly/Oman* multifactor test in *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). In *Grubart*, a stationary barge secured to the bed of the Chicago River replaced pilings driven into the bed of the river. Seven months after the project was completed, a freight tunnel near the old work site collapsed and water from the river flowed down into the tunnel and flooded buildings in downtown Chicago. *Id.* at 530. The city of Chicago and a number of land-based victims of the flood brought suits for tort damages under state law. The defendant, Great Lakes Dredge & Dock Co., filed a limitation of liability action in federal court under maritime law. The district court dismissed the limitation of liability action and the Seventh Circuit reversed. The Supreme Court granted review and affirmed the application of admiralty jurisdiction and maritime law. *Id.*

*Grubart* made two critical decisions that impact this case: (1) It reaffirmed *Sisson's* "general features" analysis and expressly rejected multifactor nexus tests; and (2) it reaffirmed locality as the main factor in tort cases involving vessels on navigable waters. First, while the *Grubart* petitioners recognized "that *Sisson* disapproved the use of four-factor or seven-factor tests," they argued that the rule in *Sisson* "implicitly left the matter open for cases like this one, where most of the victims, and one of the tortfeasors, are based on land." *Id.* at 544. But the Court held that, if the *Sisson* test is satisfied, more restrictive tests such as the *Kelly/Oman* test would necessarily be satisfied as well. There was no need, however, to adopt a test more restrictive than *Sisson* to exclude land-based parties from admiralty jurisdiction and maritime law. *Id.* at 544-45. As long as the *Sisson* test was satisfied, "it is not apparent why the need for admiralty jurisdiction in aid of maritime commerce somehow becomes less acute merely because land-based parties happen to be involved." *Id.* at 545. Thus, in the wake of *Grubart,* the *Sisson* "general features"

nexus test—not multifactor nexus tests such as the *Kelly/Oman* test—is the appropriate test to determine whether a case satisfies the nexus component of admiralty jurisdiction.

The Fifth Circuit, the originator of the *Kelly* test, noted its demise in *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1118 (5th Cir. 1995) (*en banc*). Observing that "this circuit formerly applied a multi-factor approach to determine whether there was a substantial relationship to traditional maritime activity [citing *Kelly*]," the *en banc* court concluded that this "approach was rejected by the Supreme Court in *Grubart*." *Id.* Thus, the Circuit that originated the *Kelly/Oman* test no longer uses it.

The Fourth Circuit, too, has abandoned *Oman*'s multifactor test. Only one Fourth Circuit case since 1990 has cited *Oman's* test for maritime law.[5] But in that case, the court noted that the *Oman* test had been applied too restrictively. *See Price v. Price*, 929 F.2d 131, 135 (4th Cir. 1991). Following *Sisson's* guidance, the court reversed the trial court's determination that there was no admiralty jurisdiction. *Id.* Since *Price,* the Fourth Circuit has not used *Oman's* test for the application of admiralty jurisdiction or for the application of general maritime law. To the contrary, in *White v. United States*, the court applied the *Sisson* test and did not mention *Oman* at all. *See White v. U.S.*, 53 F.3d 43, 46 (4th Cir. 1995). This is true of most Circuits that have analyzed the issue. *See Great Lakes Dredge & Dock Co. v. City of Chicago,* 3 F.3d 225, 227 (7th Cir.1993), *aff'd, Grubart,* 513 U.S. at 544 (1994) (recognizing that the Supreme Court's decision in *Sisson* abrogated the *Kelly/Oman* multifactor tests); *In re Petition of Germain*, 824 F.3d 258, 275 (2d Cir. 2016) (noting that *Kelly* was abrogated by *Grubart*); *DSMC Inc. v. Convera Corp.*, 349 F.3d 679,

---

[5] Though courts no longer follow *Oman's* multifactor test for determining whether maritime law applies, courts still follow *Oman* on other issues such as the sophisticated purchaser defense. *See, e.g., Cabasug v. Crane Co*., 988 F. Supp. 2d 1216, 1226 (D. Haw. 2013); *Goodrich v. John Crane, Inc.*, No. 4:17-cv-9-AWA-RJK, 2018 WL 5306668, at *10 (E.D. Va. Aug. 24, 2018), *report and recommendation adopted,* No. 4:17CV9, 2018 WL 4677775 (E.D. Va. Sept. 28, 2018).

683 (D.C. Cir. 2003), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) (noting that *Grubart* rejected the "multi-factor jurisdictional test in part because it 'would be hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors'").

### B.   Since *Grubart,* Federal Courts Consistently Apply Maritime Law to "Sea-Based" Asbestos Cases.

Federal courts since *Grubart* have consistently ruled that asbestos cases involving Navy seamen and shipyard workers performing "sea-based" work (i.e., work predominantly onboard ships as opposed to work mainly in land-based shops) fall under maritime law. And, most often, these rulings are made pursuant to a defendant's motion to apply maritime law. *See Dumas v. ABB Grp., Inc.*, 46 F. Supp. 3d 477, 484 (D. Del. 2014) (granting a defendant's motion to apply maritime law to an asbestos case involving a Navy seaman and noting that the "reason 'courts in Hawaii and elsewhere' no longer follow *Oman* and other like cases is because they were implicitly disavowed by the Supreme Court in" *Grubart*); *Quirin v. Lorillard Tobacco Co.*, 17 F. Supp. 3d 760, 767 (N.D. Ill. 2014) (granting a defendant's motion to apply maritime law to the asbestos claims of a Navy seaman); *Cabasug v. Crane Co.*, 956 F. Supp. 2d 1178, 1185 (D. Haw. 2013) (applying maritime law to an asbestos case involving a shipyard worker at Pearl Harbor Naval Shipyard over the plaintiff's objections, and noting that "the multi-factor connection test applied in *Myhran* has been effectively overruled by *Sisson* and *Grubart*"); *Faddish v. Buffalo Pumps,* 881 F. Supp. 2d 1361, 1367 (S.D. Fla. 2012)[6] (holding for two defendants that maritime law applies to asbestos

---

[6] While *Faddish* is still good law with regard to its decision on the application of maritime law, its application of Florida law to dismiss the plaintiff's claims on the so-called bare metal defense is questionable in light of the Supreme Court's recent decision in *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 996 (2019), in which the Court held that equipment manufacturers may be held liable under maritime law for failing to warn of the asbestos hazards of their equipment, even if it originally was supplied "bare metal". While a court considering a case sounding in admiralty jurisdiction may turn to state law for direction when confronted with a question as to which

claims by Navy seaman, and noting that asbestos shipyard "claims will almost always meet the connection test necessary for application of maritime law" if they arise from sea-based asbestos exposure and stating that "[w]ork performed aboard a ship that is docked at a shipyard is considered sea-based work, performed on navigable waters."); *Conner v. Alfa Laval, Inc.,* 799 F. Supp. 2d 455, 464 (E.D. Pa. 2011) (asbestos MDL) (holding for defendants that maritime law applies to asbestos work arising from ship-based work and noting that pre-*Sisson/Grubart* opinions regarding the application of maritime law to asbestos cases "were made under the *Kelly* framework (or a variant thereof) that the *Grubart* court expressly disavowed."); *Lambert v. Babcock & Wilcox, Co.,* 70 F. Supp. 2d 877, 885–86 (S.D. Ind. 1999) (granting a plaintiff's motion to apply maritime law to asbestos claims of a Navy seaman's widow, and noting that the *Kelly/Oman* tests are "a relic of the past").

Additionally, the major maritime treatises have recognized the Supreme Court's rejection of multifactor tests such as those adopted in *Kelly* and *Oman*. Professor Schoenbaum states that *Grubart* "rejected the application of four or seven factor tests (as developed in the Fifth Circuit) that would have narrowed admiralty jurisdiction . . . ." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* §3:5, at 173 (6th ed. 2018). *Benedict on Admiralty* notes that in *Grubart*, "the Court finally disapproved of the four-part and seven-part tests that had been used by many lower courts." 1 Steven F. Friedell, *Benedict on Admiralty* §171, at 11-9 (Rel. No. 96, April 2005). And Force and Norris states: "*Grubart* expressly rejected the Fifth Circuit's multi-factor test or any other of

---

maritime law is silent, state law cannot be applied in any way that conflicts with established maritime law principles. *Centennial Ins. Co. v. Lithotech Sales, LLC*, 29 Fed. Appx. 835, 836 (3d Cir. 2002); *Floyd v. Lykes Bros. Steamship Co.*, 844 F.2d 1044, 1046-47 (3d Cir. 1988). Because the Supreme Court's maritime asbestos decision in *DeVries* directly conflicts with the predicted Florida law decision in *Faddish,* it would be improper to supplement maritime law with Florida law and the maritime rule would control.

the lower court's tests," and they conclude it "would appear that after *Grubart* it is inappropriate for counsel to rely on or for a court to use the Fifth Circuit's 'multi-factor' test or any test for nexus other than the criteria approved in *Grubart*." 1 Robert Force & Martin Norris, *The Law of Maritime Personal Injuries* §1:15, at 1-32 (5th ed. 2004).

### C. *Grubart* Reaffirmed Locality as The Main Consideration in Tort Cases Involving Vessels on Navigable Waters.

*Grubart* also reaffirmed the locality prong as the main factor in tort cases involving vessels on navigable waters. In *Grubart,* the petitioners complained that "*Sisson* is being given too expansive a reading," and that under that reading "virtually 'every activity involving a vessel on navigable waters' would be 'a traditional maritime activity sufficient to invoke maritime jurisdiction.'" *Grubart*, 513 U.S. at 542. The Court, however, did not consider this to be a "fatal criticism." *Id.* Referring to its decision in *Executive Jet*, the Court continued:

> This Court has not proposed any radical alteration of the traditional criteria for invoking admiralty jurisdiction in tort cases, but has simply followed the lead of the lower federal courts [prior to *Executive Jet*] in rejecting a location rule so rigid as to extend admiralty to a case involving an airplane, *not a vessel*, engaged in an activity far removed from anything traditionally maritime.

*Id.* (emphasis added). The Court agreed that, though its "cases do not say that every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, **they do show that ordinarily that will be so**." *Id.* (emphasis added). Concluding, the Court clarified: "Although the existing case law tempers the locality test . . . . it reflects customary practice in seeing *jurisdiction as the norm when the tort originates with a vessel in navigable waters, and in treating departure from the locality principle as the exception*." *Id.* at 547 (emphasis added). Thus, the Court corrected the focus of the analysis to return to the locality prong as the main element in cases, like this one, involving a tort on a vessel in navigable waters.[7]

---

[7] Courts after *Grubart* have received the message. In *Wells v. Liddy,* the Fourth Circuit stated:

**D. The Supreme Court of Virginia Has Repeatedly Held that General Maritime Law Applies to Cases Like this One.**

Finally, the Supreme Court of Virginia also applies the *Sisson/Grubart* test and has specifically rejected JCI's arguments. This is significant because had this case proceeded to trial in state court—as it was scheduled to one business day after JCI's removal—it would have been tried under general maritime law. Indeed, if this Court considered the law of Virginia as part of its choice of law analysis, Virginia would apply general maritime law under the Supreme Court of Virginia's decisions in *John Crane, Inc. v. Jones,* 650 S.E.2d 851 (Va. 2007), and *Garlock Sealing Techs., LLC v. Little,* 620 S.E.2d 773 (Va. 2005).

In *John Crane, Inc.*, the trial court applied maritime law to a case involving a machinist employed by Newport News Shipbuilding and Dry Dock Company. *John Crane, Inc., 650 S.E.2d at 854.* The plaintiff was engaged mainly in "ship-based" work because his primary work occurred aboard ships under construction or repair on the navigable waters of the James River. *Id.* at 852-854. JCI appealed, and the Supreme Court of Virginia affirmed the trial court's decision to apply maritime law. The Supreme Court of Virginia noted its previous decision in *Garlock Sealing Techs. LLC v. Little* that maritime law applied to a "defendant's acts of omission and commission in manufacturing asbestos-containing material used by" a shipyard worker. *Id.* at 854 (quoting *Garlock Sealing Techs., LLC,* 620 S.E.2d at 776). The shipyard workers in both *Garlock* and *John Crane, Inc.* (as well as in the instant case) used asbestos-containing sheet gasket material "to create gaskets used on submarines" and other ships. *Id.* Applying the first element of *Sisson's* test, the

---

"'All cases involving a tort committed on navigable water, whether brought under federal admiralty jurisdiction, in state court under the saving-to-suitors clause, or in federal court under diversity jurisdiction, are governed by admiralty law.'" *Wells v. Liddy*, 186 F.3d 505, 524 (4th Cir. 1999). Similarly, in *Faddish v. Buffalo Pumps,* the court stated: "Where a worker whose claims meet the locality test was primarily sea based during the asbestos exposure, those claims will almost always meet the connection test necessary for application of maritime law." *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1367 (S.D. Fla. 2012).

Virginia Supreme Court noted that "[u]nsafe working conditions aboard a vessel have consistently been held to pose a potentially disruptive impact upon maritime commerce." *Id.* (quoting *Lambert*, 70 F.Supp.2d at 884). The Court agreed with *Lambert* that "asbestos exposure in the boiler room of a ship—could potentially disrupt maritime commerce by rendering the boiler room too hazardous to operate." *Id.* Therefore, viewed at the appropriate level of generality, as dictated by *Sisson* and *Grubart,* asbestos exposure aboard a vessel was within the class of incidents that poses a potential risk to maritime commerce.

Next the Court considered the second element of the *Sisson-Grubart* test, whether the activity giving rise to the incident bore a substantial relationship to traditional maritime activity. The Court noted that the Supreme Court of the United States "has uniformly and consistently held that ship repair is a maritime activity." *Garlock*, 620 S.E.2d at 776; *John Crane, Inc.*, 274 S.E.2d at 854. Moreover, the Court specifically observed that JCI "marketed gaskets and packing material directly for the marine industry and advertised its products for 'marine engine and general ship use.'" *John Crane, Inc.,* 650 S.E.2d at 855. JCI "also advertised its products in publications about maritime activity." *Id.* Accordingly, the Court held that exposure to asbestos-containing materials—specifically the same JCI asbestos containing sheet gasket material and packing material at issue in this case—on ships under construction or repair on navigable waters met both prongs of the *Sisson* nexus test and gave rise to maritime law. *See also Mizenko v. Elec. Motor & Contracting Co., Inc.*, 419 S.E. 2d 637 (Va. 1992) (holding that maritime law controlled the claims of a "temp" pipefitter working for a land-based company who was injured when he inhaled solvent fumes during repair on a ship docked adjacent to a commercial shipyard); *Matthews v. Commonwealth*, 482 S.E.2d 810 (Va. 1997) (noting that "[t]he Supreme Court in *Sisson* expressly

declined to adopt the *Kelly* test," and applying maritime law to a case involving a passenger who slipped, fell and was injured on board the James River ferry).

In sum, Virginia, the jurisdiction from which this case originated, would apply general maritime law to this case under the Virginia Supreme Court's decisions in the foregoing cases.

## II.     This Court Should Deny JCI's Motion because This Issue is not a Matter of Subject Matter Jurisdiction, This Case is Distinguishable from *Gilstrap,* and This Case Falls Squarely under Maritime Law.

### A.    This Is Not A Matter of Subject Matter Jurisdiction; It Is A Choice of Law Issue.

JCI's motion confuses the question of subject matter jurisdiction, on one hand, with the question of choice of law in a case arising under this Court's federal officer jurisdiction, on the other hand. As this Court knows, federal admiralty jurisdiction and federal maritime law are not necessarily the same. While this Court's admiralty jurisdiction always employs maritime law along with the special federal admiralty rules under FRCP 9(h), federal maritime law may also supply the substantive law for claims that have independent jurisdictional bases such as this Court's federal question jurisdiction, diversity jurisdiction, or removal jurisdiction and that are not filed or tried on the admiralty side of the court under the admiralty rules.

Indeed, the Supreme Court has repeatedly cautioned courts not to confuse jurisdictional questions with choice of law questions, which is precisely what JCI does here. *See, e.g., Victory Carriers, Inc. v. Law*, 404 U.S. 202, 204 (1971); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 367 n.23 (1959); *see also Pryor v. Am. President Lines*, 520 F.2d 974, 977 (4th Cir. 1975). In *Romero,* the Court considered whether a district court properly dismissed a plaintiff's claims for lack of subject matter jurisdiction. The plaintiff invoked the court's federal question jurisdiction under the Jones Act and the Court's diversity jurisdiction under 28 U.S.C. §1332. As in this case,

the plaintiff never invoked the court's admiralty jurisdiction under 28 U.S.C. § 1333 or sought application of the federal admiralty rules under FRCP 9(h). *Id.* at 356-57.

The district court dismissed the plaintiff's case and the Supreme Court reversed, noting that, "[a]s frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action." *Id.* at 359; *see also Victory Carriers, Inc.*, 404 U.S. at 204 (noting that "under either section the claim that a ship or its gear was unseaworthy would be rooted in federal maritime law. The dispositive question, therefore, is not jurisdictional but whether maritime law applies to this claim."). *Romero* went on to recognize, pursuant to the petitioner's invocation of diversity jurisdiction under 28 U.S.C. § 1332, that "[s]ince the original Judiciary Act also endowed the federal courts with diversity jurisdiction, common-law remedies for maritime causes could be enforced by the then Circuit Courts [now district courts] when the proper diversity of parties afforded access." *Id.* at 362. For this reason, "[p]arties in maritime cases are not . . . compelled to proceed in the admiralty at all, as they may resort to their common-law remedy in the State courts, or in the Circuit Court [now district court], if the party seeking redress and the other party are citizens of different States." *Id.* at 370. In short, "[l]itigants of diverse citizenship are now able to invoke the federal law forum for the trial of saving-clause cases." *Id.* at 376-77. Thus, a case may be tried under substantive maritime law without invoking a federal court's admiralty jurisdiction and, in turn, without admiralty's unique procedural rules and lack of jury trial.[8]

---

[8] The maritime law jurisprudence of the Supreme Court of Virginia illustrates the concurrent jurisdiction granted to federal and state courts in maritime cases under the "savings to suitors" clause. The "savings to suitors" clause of 28 U.S.C. § 1333 grants concurrent jurisdiction to State courts—apart from proof of federal admiralty jurisdiction under 28 U.S.C. § 1333. A State court is not governed at all by the Admiralty jurisdiction statute of 28 U.S.C. § 1333; yet for more than 200 years, State courts have been trusted with the concurrent development of *federal* substantive maritime law. As *Romero* noted, "[t]he role of the States in the development of maritime <u>law</u> is a

This case was brought in state court under the "savings to suitors" clause of 28 U.S.C. § 1333. Plaintiffs have repeatedly demanded a jury trial, and Plaintiffs have never invoked the federal admiralty rules under FRCP 9(h). This Court has ruled that it has independent subject matter jurisdiction under the Federal Officer Removal Statute, 28 U.S.C. § 1442.[9] Where there is an independent basis for jurisdiction—such as federal question, diversity, or removal jurisdiction—this Court may try the case on the "law side" of this Court, without requiring an independent showing of maritime jurisdiction under 28 U.S.C. § 1333. Because this Court has already decided it has removal jurisdiction, it should deny JCI's Rule 12(b)(1) motion to dismiss Plaintiffs' claims for lack of federal subject matter jurisdiction.

### B.  This Case is Distinguishable from *Gilstrap*.

This maritime product liability case is distinguishable from the Virginia premises liability claims at issue in *Gilstrap*. Significantly, the federal opinions cited above distinguished between ship-based work, which gave rise to maritime law, and shore-based work, which did not. "Work performed aboard a ship that is docked at a shipyard is considered sea-based work, performed on

---

role whose significance is rooted in the Judiciary Act of 1789 and the decisions of this Court." *Id.* at 372 (emphasis added).

[9] While this Court has already ruled that it has federal removal jurisdiction, it may choose to vacate its removal order pursuant to *Plaintiffs' Motion to Vacate Removal Order Pursuant to Rule 60(b) or, Alternatively, Hold that JCI is Estopped or Waived Asserting a Government Contractor Defense as to Certain Issues*. (ECF 115), based on JCI's new implicit admission that its notice of removal was untimely. In Plaintiffs' Motion to Vacate, Plaintiffs point out that JCI (a) did not remove this case until a year and a half after service of the complaint, (b) admitted that it knew from the face of the complaint that Plaintiffs were alleging a failure to warn on the packages of JCI's products, (c) claimed that this did not put JCI on notice of a colorable government contractor defense, but (d) now claims that it is immune to Plaintiffs' claims—clear on the face of their complaint—that JCI failed to warn on its packages. By asserting a government contractor defense to Plaintiffs' allegations regarding warnings on packaging, JCI necessarily admits that this case was removable from the time it was served with Plaintiffs' original complaint. Accordingly, JCI's notice of removal came almost a year and a half late. But, assuming this Court chose to vacate its order, it would be on the basis of the procedural default of JCI's untimely removal, not a substantive lack of subject matter jurisdiction.

navigable waters." *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1367 (S.D. Fla. 2012) (citing *Sisson v. Ruby,* 497 U.S. 358 (1990). "This includes work aboard a ship that is in 'dry dock.'" *Id.* (citing *Deuber v. Asbestos Corp. Ltd.,* 2011 WL 6415339 *1 n. 1 (E.D.Pa.2011)). As explained above in the Statement of Facts, Mr. Mullinex's work was ship-based work. His day to day job involved operating, maintaining, and repairing the propulsion plant of launched, commissioned ships while they were underway and during repairs and overhauls at shipyards. His standard duty station was in the engine rooms of his respective ships and that is where his asbestos exposure occurred. And, Mullinex's lawsuit is solely a maritime product liability lawsuit under *E. River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858, 864 (1986). Mullinex's Amended Complaint alleges that the case arises under "the law of Virginia and within the admiralty and maritime jurisdiction pursuant to the "Savings to Suitors" clause of 28 U.S.C. § 1331(1) and 46 U.S.C. §30101 and the general admiralty and maritime law of the United States." (ECF 1-4, at 5, ¶7; *see also id.* at 11, ¶ 12). Though the Amended Complaint states that it arises in part under Virginia law, this is to leave open the opportunity for this Court to supplement maritime law with Virginia law in the proper instances.[10]

   "In contrast, work performed in other areas of the shipyard, or on a dock, such as a machine

---

[10] Supplementation occurs on a case by case basis when "there is no well-established federal admiralty rule and there is no need to create one." 1 Schoenbaum, Admiralty and Maritime Law, 227-228 (5th ed. 2011). In such cases, the law of the case is still maritime law, but the court supplements a part of the general maritime law with state law to the extent that the state law rule does not conflict with maritime law. Supplementation is used when national uniformity is not a concern, such as with the measure of damages available to a plaintiff in a particular case, *see, e.g., Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 211 (1996) (allowing maritime damages to be supplemented with state law damages in a case involving a jet-ski accident and noting that "[v]ariations of this sort had long been deemed compatible with federal maritime interests"), or when an issue pertains to a local procedural matter historically delegated to the States, *see, e.g., Am. Dredging Co. v. Miller*, 510 U.S. 443, 455 (1994) (finding that state forum non-conveniens rules are procedural rules that do not impair maritime uniformity).

shop in the shipyard, is considered land-based work." *Faddish*, 881 F. Supp. 2d at 1367. As discussed above, when this Court addressed the shipyard's Rule 12(b)(6) motion to dismiss in *Gilstrap,* the plaintiff had already voluntarily dismissed all product liability claims and the only remaining claims related to the alleged premises liability of the Huntington Ingalls shipyard.

Moreover, the plaintiffs emphasized that Mr. Gilstrap's premises liability claims were limited to the time prior to the commissioning of the vessel in September 1960. While Exhibit A to the plaintiffs' amended complaint said that Mr. Gilstrap was "Engine Room Supervisor" of USS Robert E. Lee from 1959-1964, from October 1959 to September 1960 the vessel was an unnamed, uncommissioned hull that, according to the plaintiffs' allegations, was still under the Shipyard's "ownership, dominion, and control." (Amend. Comp. in *Gilstrap,* ECF 12 from *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM, at 3, ¶ 2). Because the Navy had not yet accepted or commissioned the vessel, Gilstrap would not have been engine room supervisor of something the Navy did not yet own. Moreover, in the plaintiffs' premises liability count, Count IV, they specified what the premises was—Newport News Shipbuilding, Newport News, Virginia. (Amend. Comp. in *Gilstrap,* ECF 12 from *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM, at 13, ¶ 43). The count went on to state that the premises liability defendants caused asbestos containing materials to be used and manipulated on "each of the aforesaid respective premises, **including the general areas of the shipyard at large,**" (Amend. Comp. in *Gilstrap,* ECF 12 from *Gilstrap v. HII,* 4:19-cv-68-AWA-DEM, at 14, ¶ 45 (emphasis added)), and that count never states that Mr. Gilstrap was actually exposed on any ship or launched vessel under construction; nor does it contain any specific allegation that would enable this Court to determine whether any such ship-based work, if any, preponderated over his land-based work.

22

Finally, at no point did this Court hold that it lacked subject matter jurisdiction over the plaintiffs' claims in *Gilstrap*; it merely decided that the plaintiffs' premises liability claims arose under Virginia law as a threshold matter so that it could know whether to evaluate the sufficiency of the plaintiffs' complaint under federal maritime law or Virginia law. (*See* ECF 19 in *Gilstrap*, 4:19-cv-68, Order, at 5). Thus, again, JCI's reliance on *Gilstrap* for its Rule 12(b)(1) challenge on this Court's subject matter jurisdiction is misplaced.

Accordingly, this case is distinguishable from *Gilstrap* and this Court should not follow its decision in *Gilstrap* in determining the governing law in this case.

### C. This Case Arises Under Maritime Law Under the Supreme Court's Controlling Precedent.

Though JCI never analyzes the nexus test under the prevailing law as set forth in *Sisson* and *Grubart*, this case meets the nexus test's requirements. *See Grubart*, 513 U.S. at 534; *Sisson*, 497 U.S. at 364. First, this case clearly satisfies the locality test, as all of Mullinex's exposure occurred on vessels on navigable waters. Second, this case meets the nexus test because (1) the "'general features of the type of incident involved,'" in this case had "'a potentially disruptive impact on maritime commerce;'" and (2) the "'general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Grubart*, 513 U.S. at 534 (quoting *Sisson*, 497 U.S. at 363, 364 n.2, 365).

### 1. The General Features of the Type of Incident in This Case Have a Potentially Disruptive Impact on Maritime Commerce.

Under the first prong of the nexus test, the "general features of the type of incident involved" here have a "potentially disruptive impact on maritime commerce." *Id.* When analyzing this prong, courts must first describe the incident "at an intermediate level of possible generality." *Id.* at 538. As discussed above, the Court in *Sisson* emphasized that this portion of the analysis does not "turn on the particular facts of the incident . . . such as the source of the fire" in *Sisson*—

a defective washer/dryer unit manufactured by a land-based company. *Sisson*, 497 U.S. at 360. Describing the incident at the appropriate level of generality, the Court simply stated that it was a "fire that began on a noncommercial vessel at a marina located on a navigable waterway." *Id*. at 362. Following this lead, the Court in *Grubart* defined the incident as "damage by a vessel in navigable water to an underwater structure." *Grubart*, 513 U.S. at 539. Using the same level of generality, the incident at issue here would be the release of a toxic, carcinogenic substance during the operation and repairs on Navy vessels on navigable waters.

The next step under the first prong is to determine whether this incident, as described at the appropriate level of generality, has 'a potentially disruptive impact on maritime commerce.'" *Grubart*, 513 U.S. at 534. This step, likewise, "does not turn on the *actual* effects on maritime commerce," but "whether such an incident is likely to disrupt commercial activity." *Sisson*, 497 U.S. at 363 (emphasis in original). To be sure, the Court in *Sisson* did not consider the source of the fire or its actual impact, but the fire's potential impact—broadly speaking—on maritime commerce. Thus, the Court held that a fire had a potential impact on maritime commerce even though "no commercial vessels happened to be docked at the marina" when the incident occurred. *Id*.

The general activity in this case—the release of a toxic, carcinogenic substance during ship-based repairs on Navy vessels in the navigable waters—not only has a potential impact, but *is* having an enormous impact on maritime commerce. Asbestos is so dangerous that the U.S. Navy and every American commercial ship owner are now required to engage in extensive remedial and protective measures anytime asbestos products are disturbed aboard any ship. Otherwise the ship may be considered unseaworthy. *See, e.g., Miller v. American President Lines, Ltd.,* 989 F.2d 1450, 1464 (6th Cir. 1993) (affirming verdict that ship was unseaworthy due to asbestos); *Vaughn*

*v. Ferrell Lines, Inc.*, 937 F.2d 953 (4th Cir. 1991) (same). The presence and release of asbestos on vessels has forced ship owners to incur remediation costs and the related costs of removing a ship from the stream of commerce to perform the remediation. Ship owners must also face rising Protection and Indemnity (P&I) premiums, the potential of having asbestos-related injuries excluded from P&I coverage altogether, and the potential of having a maritime lien asserted against the vessel. *See* 46 U.S.C. § 31301 (5)(B).

Moreover, the economic impact arising just from the claims of the people who have been disabled or killed by exposure to asbestos-containing products is staggering. The Supreme Court has noted that, "[o]n the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected. The final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 822 (1999). The portion of this "stream of claims" that arises from exposure on board ships has already had an enormous impact through claims under the Longshoremen and Harbor Workers' Compensation Act, *see, e.g., New Orleans Stevedores v. Ibos*, 317 F.3d 480, 482 (5th Cir. 2003); *Newport News Shipbuilding & Dry Dock Co. v. Stilley*, 243 F.3d 179 (4th Cir. 2001), the Jones Act, *see, e.g., Marine Asbestos Cases v. Am. Hawaiian Cruises, Inc.*, 265 F.3d 861 (9th Cir. 2001) (consolidated case involving 174 cases under the Jones Act, 46 U.S.C. § 688 *et seq.*); *Miller v. American Heavy Lift Shipping*, 231 F.3d 242 (6th Cir. 2000), and under general maritime law, *see, e.g., Dicola v. Am. S.S. Owners Mut. Prot. & Indem. Assoc. (In re Prudential Lines)*, 158 F.3d 65, 68 (2d Cir. 1998) (noting that "approximately 5,000 Claimants have alleged that they suffered asbestos-related bodily injuries by exposure to asbestos while working aboard Prudential's ships," and seek damages, *inter alia*, under general maritime law). All

of this has had, not only a potential impact, but a tremendous actual impact on maritime commerce. Accordingly, this case meets the first prong of the nexus test.

2. **The General Character of the Activity Giving Rise to the Incident Shows a Substantial Relationship to Traditional Maritime Activity.**

This case also meets the second prong of the nexus test. The second prong requires the court to "determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Grubart*, 513 U.S. at 534.

Under *Sisson* and *Grubart*, "the relevant 'activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Sisson*, 497 U.S. at 364. In *Sisson,* the Court determined that the relevant "activity" was "storage and maintenance of a vessel at a marina on navigable waters." *Id.* at 365-366. Even though the vessel was not a commercial vessel and the incident caused damage to other noncommercial vessels and landside structures, the Court held that the case arose under maritime law because docking and maintaining vessels was a traditional maritime activity. *Id.* Significantly, the Court in *Grubart* clarified that "as long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will 'involve' such traditional maritime activity and will meet the second prong." *Grubart,* 513 U.S. at 541.

Under the guidance of *Sisson* and *Grubart,* the relevant activity at the appropriate level of generality in this case would be the operation, maintenance and repair of the propulsion plant of a vessel in navigation and at port. Since the propulsion plant of a vessel is vital to the ship's ability to operate, navigate and conduct any other maritime related activities, this activity is substantially related to a traditional maritime activity. *See*, *e.g.*, *Lambert,* 70 F. Supp. 2d at 884 (holding that the relevant activity was "maintenance and operation of a ship's boiler room," and that this activity "is vital to the ship's ability to conduct maritime related activities."); *Faddish*, 881 F. Supp. 2d at

1368 (finding that service aboard Navy ship as fireman and fireman apprentice bore "a sufficient connection to traditional maritime activities to warrant imposition of maritime law."); *Garlock Sealing Techs., LLC*, 620 S.E.2d at 776 (holding that the "Supreme Court has uniformly and consistently held that ship repair is a maritime activity"); *John Crane, Inc.*, 650 S.E.2d at 854 (reaffirming its holding in *Garlock Sealing Techs., LLC* that ship repair is a traditional maritime activity). In the course of his duties as a machinist mate in the engine rooms of three different ships, Mullinex was exposed to a toxic, carcinogenic substance, asbestos while operating, maintaining, and repairing these ships' propulsion plants. Without these operation, maintenance, and repair activities, these ships would have been dead in the water. Accordingly, these activities are traditional maritime activities necessary to keep the ship operation and in navigation.

Even if this Court chooses to define the relevant activity at a more specific level directly related to JCI's own actions, courts have repeatedly found that "the manufacture of products for use on vessels," likewise, "bears a substantial relationship to traditional maritime activity." *Dumas*, 46 F. Supp. 3d at 483–84; *see also Conner,* 799 F.Supp.2d at 469 (following the Supreme Court of Virginia's decision in *John Crane, Inc. v. Jones* to hold that manufacturing products for use on vessels "bears a substantial relationship to traditional maritime activity"); *Cabasug*, 956 F. Supp. 2d at 1190 (finding that "the general activity giving rise to the incident is the manufacture of products for use on vessels" and that it "bears a substantial relationship to traditional maritime activity"); *John Crane, Inc.*, 650 S.E.2d at 854 (holding that in addition to ship repair being a traditional maritime its holding in *Garlock Sealing Techs., LLC* that ship repair is a traditional maritime activity). In fact, after analyzing the record in *John Crane, Inc. v. Jones,* the Supreme Court of Virginia concluded that JCI's direct marketing of products directly to the maritime industry made it all the more related to maritime activity. According to the court:

27

> The record in this case reflects that during the time Garland Jones was exposed to asbestos-containing products manufactured by Crane, Crane marketed gaskets and packing material directly for the marine industry and advertised its products for "marine engine and general ship use." Crane also advertised its products in publications about maritime activity. This activity bore a substantial relationship to traditional maritime activities. The fact that Crane did not directly undertake any activity aboard a maritime vessel does not obviate this connection.

*John Crane, Inc.*, 650 S.E.2d at 855. Nothing has changed between Garland Jones' exposure and Herbert Mullinex's exposure. JCI engaged in the same maritime advertising to the same marine industry in the same publications here as it did in *John Crane, Inc. v. Jones.*

JCI may argue that its negligence stopped when its products were put into the stream of commerce. It is basic maritime law, however, that "the fact that the defective product was manufactured on land or the wrongful act occurred on land is of no significance" in a maritime product liability action. 1 Thomas J. Shoenbaum, ADMIRALTY AND MARITIME LAW § 3:11, at 228 (6th ed. 2018). This is because admiralty courts have long held that a wrongful act is not actionable negligence until it is consummated, or takes effect, upon a victim. *See, e.g., The Plymouth*, 70 U.S. 20, 36 (1866); *Sperry Rand Corp. v. Radio Corp. of America*, 618 F.2d 319, 321 (5th Cir. 1980). If a person's wrongful act does not actually injure someone, it "furnishes no cause of action; it is *damnum absque injuria.*" *The Plymouth*, 70 U.S. at 36. JCI's negligent failure to warn of the dangers of its products was not limited to a discrete point of manufacture in a land-based factory; its failure to warn continued through to Mullinex's unwarned use of these marine products in the engine rooms of ships on navigable waters. *See, e.g., Smith v. Pan Air Corp.,* 684 F.2d 1102, 1107, 1111 (5th Cir. 1980) ("In products liability cases . . . the place where the negligence or wrongful act occurs is not decisive. The place injury occurs and the function the injured person was performing at the time are more significant."); *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 174 (5th Cir. 1975) (holding that maritime jurisdiction applied "even though the conduct complained of may have been negligent construction or defective design

and may have occurred ashore"); *Sears, Roebuck & Co. v. Am. Pres. Lines, Ltd.*, 345 F. Supp. 395, 402 (N.D. Cal. 1971) ("Admiralty jurisdiction is proper even though the negligent act occurs on land" if the "damage was inflicted at a point within admiralty jurisdiction.").

In short, JCI's behavior gave rise to the quintessential maritime product liability action. *See East River S.S. Corp.*, 476 U.S. at 864 (recognizing product liability as part of the general maritime law); *Jig The Third Corp.*, 519 F.2d at 173 (5th Cir. 1975) (affirming product liability verdict for a negligent design of "4 1/2-inch, cold-rolled steel shaft instead of the standard 4-inch, stainless steel shaft"); *Watz v. Zapata Off--Shore Co.*, 431 F.2d 100, 115 (5th Cir. 1970) (ruling that "Watz therefore has a remedy against Eaton in admiralty" for negligent design and testing of a chain that caused injury to a land-based shipbuilder); *Schaeffer v. Michigan-Ohio Navigation Co.*, 416 F.2d 217, 218 (6th Cir. 1969) (recognizing product liability action in claim against Westinghouse for negligence, negligent failure to warn, and breach of an implied warranty regarding a dumbwaiter installed on a ship). Accordingly, this Court should deny JCI's motion and apply general maritime law to this case.

## CONCLUSION

This Court should deny JCI's motion. First, this Court has already ruled that it has federal subject matter jurisdiction over this case independent of its admiralty jurisdiction, and a motion under Rule 12(b)(1) is not the proper vehicle to raise the choice of law issues that JCI actually argues in its motion. Second, this maritime product liability case is distinguishable from the plaintiffs' premises liability claims in *Gilstrap*. Finally, under the governing U.S. Supreme Court precedent since *Sisson* and *Grubart*, cases like this one have consistently been held to meet both elements of the maritime nexus test necessary for the implementation of general maritime law. This case is no different because this case satisfies both elements of the nexus test, as demonstrated

above. Accordingly, this Court should deny JCI's motion, hold that general maritime law applies

to this case, and grant any additional relief it deems necessary under the circumstances.

Respectfully Submitted,

By: /s/ William W.C. Harty
*Counsel for Plaintiffs*

William W.C. Harty, Esq. (VSB # 45447)
Robert R. Hatten, Esq. (VSB # 12854)
Hugh B. McCormick, III, Esq. (VSB # 37513)
Erin E. Jewell, Esq. (VSB # 71082)
Samantha P. Graham, Esq. (VSB# 93529)
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue - Suite 300
Newport News, VA 23602
(757) 223-4500 Telephone
(757) 249-3242 Facsimile
Pleadings@pwhd.com
wharty@pwhd.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of February, 2020, I electronically filed Plaintiffs' Opposition to John Crane Inc.'s Motion to Dismiss Plaintiffs' Maritime Law Claims for Lack of Subject Matter Jurisdiction pursuant to Fed.R.Civ.P. 12 (b)(1) with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| Eric G. Reeves, Esq. | Counsel for John Crane, Inc. |
| --- | --- |
| Brian J. Schneider, Esq. | |
| Mary Louise Roberts | |
| Lisa Moran McMurdo | |
| **MORAN REEVES & CONN PC** | |
| 1211 East Cary Street | |
| Richmond, VA 23219 | |